68 U.S. 83 (1863)
1 Wall. 83
MERCER COUNTY
v.
HACKET.
Supreme Court of United States.

*86 Mr. Stewart for the county.
Mr. Loomis for the bondholder.
*92 Mr. Justice GRIER delivered the opinion of the court:
The bonds declare on their face that the faith, credit, and property of the county is solemnly pledged, under the authority of certain acts of Assembly, and that in pursuance of said act the bonds were signed by the commissioners of the county. They are on their face complete and perfect; exhibiting no defect in form or substance; and the evidence offered is to show the recitals on the bonds are not true; not that no law exists to authorize their issue, but that the bonds *93 were not made "in pursuance of the acts of Assembly" authorizing them.
We have decided in the case of Commissioners of Knox County v. Aspinwall,[*] that where the bonds on their face import a compliance with the law under which they were issued, the purchaser is not bound to look further. The decision of the board of commissioners may not be conclusive in a direct proceeding to inquire into the facts before the rights and interests of other parties had attached; but after the authority has been executed, the stock subscribed, and the bonds issued and in the hands of innocent holders, it would be too late, even in a direct proceeding, to call it in question.
The case of Mercer County v. The Railroad[] has been cited as governing this case. But on examination it will be found not to contradict the doctrine we have just stated. That was a bill in equity, praying an injunction against the issuing of a portion of the bonds not yet delivered over to the company, or negotiated by them. It charged that the commissioners had not pursued the conditions, limitations, and restrictions of the act that authorized their issue; that, by the act, "all such subscriptions shall be made after and not before the amount of such subscriptions shall have been designated, advised, and recommended by a grand jury," whereas the grand jury only "recommended that the commissioners of Mercer County subscribe to the capital stock of the Pittsburg and Erie Railroad, to such amount and under such restrictions as may be required by the act of Assembly, by authorizing them to subscribe, to an amount not exceeding $150,000." The bill charged also most gross frauds perpetrated by the company, which fully justified the decree of the court, without resorting to the very ingenious and rather astute criticism of the phraseology of the grand jury. It is true they recommend only, and have not used the words "designate and advise" a subscription not to exceed $150,000. It would require no great latitude of construction to treat this, as the commissioners might justly do, as a *94 substantial compliance with the act. But it would be contrary to good faith and common justice to permit them to allege a newly discovered construction of an equivocal power, after they have sold the bonds, and they have passed (as is admitted in this case) into the hands of bonâ fide purchasers for value. It is proper to state that the construction given has the assent of only two of the judges of that learned court, so that it has not the force of precedent even if it applied to this case. But it is due also to them to say, that they intimate no opinion as to how far the reasons given for enjoining the further issue of the bonds ought to affect their validity in the hands of "innocent holders."
The proviso to the act authorizing the subscription declares, "that the acceptance of this act shall be deemed also an acceptance of the provisions of the act passed the eleventh day of May, 1851, entitled `An act fixing the gauges of railroads in the County of Erie.'" Now it is very plain that the acceptance of the bonds authorized by this act, operated per se as an acceptance of the gauge law. It needed no resolution of the railroad corporation on their minutes. They were estopped by law after receipt of the bonds, until they were afterwards released by statute from the condition. But if that were not sufficient, it may be stated as a matter of history, that on the 24th of December, 1851, the stockholders passed a resolution "accepting and agreeing to be bound by the provisions of the act aforesaid, being an act fixing the gauge of railroads in Erie County." This fact, though overlooked in the case last mentioned, was afterwards brought to the notice of the same court, on the trial of a subsequent cause between the same parties. As any subsequent resolution of the railroad company refusing compliance with this condition annexed by statute to their acceptance of the county subscriptions would be fraudulent and void, the court did not err in refusing to admit the evidence offered, or to permit the defendants to prove that the recitals of their bonds were untrue.
2. Can evidence of the fraud practised by the railroad *95 company to whom these bonds were delivered, and by whom they were paid to bonâ fide holders for value, or the fact that they were negotiated at less than their par value, be received to defeat the recovery of the plaintiff below?
This species of bonds is a modern invention, intended to pass by manual delivery, and to have the qualities of negotiable paper; and their value depends mainly upon this character. Being issued by States and corporations, they are necessarily under seal. But there is nothing immoral or contrary to good policy in making them negotiable, if the necessities of commerce require that they should be so. A mere technical dogma of the courts or the common law cannot prohibit the commercial world from inventing or using any species of security not known in the last century. Usage of trade and commerce are acknowledged by courts as part of the common law, although they may have been unknown to Bracton or Blackstone. And this malleability to suit the necessities and usages of the mercantile and commercial world is one of the most valuable characteristics of the common law. When a corporation covenants to pay to bearer and gives a bond with negotiable qualities, and by this means obtains funds for the accomplishment of the useful enterprises of the day, it cannot be allowed to evade the payment by parading some obsolete judicial decision that a bond, for some technical reason, cannot be made payable to bearer.
That these securities are treated as negotiable by the commercial usages of the whole civilized world, and have received the sanctions of judicial recognition, not only in this court,[*] but of nearly every State in the Union, is well known and admitted.
But we have been referred to the case of Diamond v. Lawrence County,[] for a single decision to the contrary. The learned judge who delivered the opinion of the court in that case says, "We will not treat these bonds as negotiable securities. On this ground we stand alone. All the courts, American *96 and English, are against us. We know the history of these municipal and county bonds, how the legislature, yielding to popular excitement about railroads, authorized their issue; how grand jurors and county commissioners and city officers were moulded to the purposes of speculators; how recklessly railroad officers abused the overwrought confidence of the public, and what burdens of debt and taxation have resulted to the people,  a moneyed security was thrown upon the market by the paroxysm of the public mind," &c.
If this decision of that learned court was founded on the construction of the constitution or statute law of the State, or the peculiar law of Pennsylvania as to titles to land, we would have felt bound to follow it. But we have often decided that on questions of mercantile or commercial law, or usages which are not peculiar to any place, we do not feel bound to yield our own judgment, especially if it be fortified by the decision of "all other English and American courts." These securities are not peculiar to Pennsylvania, or governed by its statutes or peculiar law.
Although we doubt not the facts stated as to the atrocious frauds which have been practised, in some counties, in issuing and obtaining these bonds, we cannot agree to overrule our own decisions and change the law to suit hard cases. The epidemic insanity of the people, the folly of county officers, the knavery of railroad "speculators," are pleas which might have just weight in an application to restrain the issue or negotiation of these bonds, but cannot prevail to authorize their repudiation, after they have been negotiated and have come into the possession of bonâ fide holders.
In the case of Woods v. Lawrence County,[*] as a corollary from the principles stated, we have decided, that in a suit brought on the coupons of these bonds by a bonâ fide holder, his right to recover is not affected by the fact that the railroad company sold the bonds at a discount, contrary to the provisions of their charter, which forbids the sale of them at less than their par value.
*97 As the evidence offered, and overruled by the court, could not have established a defence to the case made by the plaintiff below, the court did not err in refusing to receive it.
JUDGMENT AFFIRMED WITH COSTS.
NOTES
[*] 21 Howard, 545.
[] 27 Pennsylvania State, 389.
[*] White v. Vermont Railroad Co., 21 Howard, 575.
[] 37 Pennsylvania State, 353.
[*] 1 Black, 386.